UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

CASSANDRA LEIGH HONAKER,    )
                            )
        Plaintiff,          )          2:25-CV-16
                            )
    vs.                     )
                            )
COMMISSIONER OF SOCIAL      )
SECURITY ADMINISTRATION,    )
                            )
        Defendant.          )

## REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Claimant's claims for Disability Insurance Benefits and Supplemental Security Income were denied administratively by Defendant Commissioner following a hearing before an Administrative Law Judge. This action is for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). Claimant has filed a Complaint [Doc. 1] and a Brief in Support [Doc. 12], to which the Commissioner has filed a Response. [Doc. 14]. For reasons set forth below, the undersigned **RECOMMENDS** that Claimant's request for remand be **DENIED**, and the final decision of the Commissioner be upheld.

## I.    APPLICABLE LAW – STANDARD OF REVIEW

A review of the Commissioner's findings is narrow. The Court is limited to determining (1) whether substantial evidence supported the factual findings of the Administrative Law Judge ("ALJ") and (2) whether the Commissioner conformed to the relevant legal standards. 42 U.S.C. § 405(g); *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009). "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Mebane v. Comm'r of Soc. Sec.*, 382 F. Supp. 3d 718, 721 (S. D. Ohio 2019). "It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury." *LeMaster v. Sec'y of Health & Human Servs.*, 802 F.2d 839, 840 (6th Cir. 1986); s*ee also Marks v. Colvin*, 201 F.Supp.3d 870, 874 (S.D.Ohio, 2016); The Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020). At the same time, the Court may consider any evidence in the record, regardless of whether it was cited by the ALJ. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d. 528, 535 (6th Cir. 2001); *see also Williams v. Kijakazi,* 600 F. Supp. 3d 852, 857 (W.D. Tenn. 2022). A decision supported by substantial evidence must stand, even if the evidence could also support a different decision. *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010) (citing *Blakely*, 581 F.3d at 405); *see also Richardson v. Saul*, 511 F. Supp. 3d 791, 797 (E.D. Ky. 2021). On the other hand, a decision supported by substantial evidence "will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007); *see also Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 752 (N.D. Ohio 2020).

A claimant must suffer from a "disability" as defined by the Act to be eligible for benefits. "Disability" includes physical and mental impairments that are "medically determinable" and so severe as to prevent the claimant from (1) performing her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. 42 U.S.C. § 423(a). A five-step sequential evaluation applies in disability determinations. 20 C.F.R. § 404.1520. The ALJ's review ends with a dispositive finding at any step. *See Colvin v. Barnhart*, 475 F.3d 727,

730 (6th Cir. 2007); *see also Ward v. Commissioner of Social Security*, 613 F.Supp.3d 1034, 1040

(S.D.Ohio, 2020). A full review addresses five questions:

1.  Has the claimant engaged in substantial gainful activity?

2.  Does the claimant suffer from one or more severe impairments?

3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the "Listings"), 20 C.F.R. Part 404, Subpart P, Appendix 1?

4.  Considering the claimant's Residual Functional Capacity ("RFC"), can he or she perform his or her past relevant work?

5.  Assuming the claimant can no longer perform his or her past relevant work, and also considering the claimant's age, education, past work experience, and RFC, do significant numbers of other jobs exist in the national economy which the claimant can perform?

*See* 20 C.F.R. § 404.1520. A claimant bears the burden of establishing entitlement to benefits by

proving the existence of a disability. *See Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510,

512 (6th Cir. 1994); *see also Bowermaster v. Comm'r of Soc. Sec.*, 395 F. Supp. 3d 955, 959 (S.D.

Ohio 2019). It is the Commissioner's burden to establish a claimant's ability to work at step five.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990); *see also Jones v. Berryhill*, 392 F. Supp.

3d 831, 855 (M.D. Tenn. 2019).

## II.    PROCEDURAL AND FACTUAL OVERVIEW

Cassandra Leigh Honaker ("Claimant") filed an application for Social Security Disability

on December 14, 2020, alleging a disability onset date of March 1, 2020. (Tr. 10). Claimant

contended that several musculoskeletal ailments, fibromyalgia, various breathing disorders,

anxiety, and depression render her disabled. (Tr. 72). Her claims were denied initially and upon

reconsideration. (Tr. 96-99, 108-110). Thereafter, Claimant requested a hearing which was

conducted on August 22, 2023, before Administrative Law Judge ("ALJ") Keith C. Pilkey.

3

Following the hearing, the ALJ issued a decision on November 24, 2023, finding that Claimant was not disabled. (Tr. 10-29). In his decision, the ALJ found the following:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.
2. The claimant has not engaged in substantial gainful activity since March 1, 2020, the alleged onset date (20 CFR 404.1571 et seq.).
3. The claimant has the following severe impairments: fibromyalgia, cervical spondylosis, scoliosis, osteoarthritis, shoulder impingement, depression, anxiety, and attention deficit hyperactivity disorder (ADHD) (20 CFR 404.1520(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant can occasionally reach overhead bilaterally; with no climbing of ladders, ropes and scaffolds; can occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch and crawl; retains the ability to understand, remember, and carry out detailed, but not complex instructions to maintain concentration, persistence, and pace on those types of tasks for two hour periods over the course of an eight hour workday, and can tolerate occasional interaction with the public.
6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).
7. The claimant was born on January 26, 1979, and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).
8. The claimant has at least a high school education (20 CFR 404.1564).
9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).
11. The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2020, through the date of this decision (20 CFR 404.1520(g)).

*See* (Tr. 12-29). Claimant subsequently requested Appeals Council review. (Tr. 179-180). This review was denied. (Tr. 1-6). As a result, the ALJ's decision ("the decision") became the final decision of the Commissioner of Social Security.

On appeal, Claimant asserts that the ALJ erred in two ways: (1) by improperly formulating her RFC because he failed to appropriately evaluate the record and substantiate his findings, and

(2) by failing to follow the directives in SSR 16-3P(d) when considering Claimant's subjective symptoms.

As to her argument that the ALJ erred in formulating her RFC, Claimant does not contest the ALJ's findings regarding her physical abilities and acknowledges that "she could on occasion perform at the light level of exertions with the limitations as provided by the ALJ." [Doc. 12, p. 11]. Instead, she asserts that while she maintained the ability to physically perform light work at times, she could not do so consistently and, as a result, is disabled from all work. Claimant contends that in finding she was not disabled, the ALJ both failed to properly evaluate the record evidence and "mischaracterized" it in supporting his conclusions. [Doc. 12, pp. 11-12]. To support her argument, Claimant cites to several specific portions of the records, including the testimony of the vocational expert, who opined that "particularly for entry-level employment, chronically missing more than one day of work per month would [...] be problematic and lead to the individual not being able to maintain employment." (Tr. 68); [Doc. 12, pp. 11-12]. In addition, Claimant points to several specific assertions that the ALJ used to support his conclusion which the Claimant does not believe are supported by substantial evidence, including:

1) The ALJ's statement that Claimant "retains the ability to vacation." [Doc. 12, pp. 12-13].

2) The ALJ's reliance on a contractual arrangement with her former company that predated Claimant's injury onset date. [Doc. 12, p. 13].

3) The ALJ's statement that Claimant volunteers. [Doc. 12, pp. 13-14].

4) The ALJ's reliance on Claimant assisting her father with his own disability application. [Doc. 12, pp. 14-15].

5) The ALJ's overstatement of Claimant's ability to read. [Doc. 12, pp. 15-16].

6) The ALJ's statement that Claimant did not find massage therapy helpful. [Doc. 12, pp. 11-18].

In addressing her second assignment of error, Claimant asserts that the ALJ improperly

evaluated the intensity, persistence, and limiting effects of Claimant's symptoms as required by SSR 16-3P(d) by failing to fully consider the testimony offered. Claimant asserts that the record evidence demonstrates 1) the severity of her symptoms fluctuates day to day, 2) it is unlikely that she could maintain regular work attendance within the limitations assigned by the ALJ, and 3) the ALJ committed reversible error when he failed to properly account for the impact of Claimant's symptom fluctuations. In specific support, Claimant points to portions of testimony provided by her and her husband, the records of her longstanding treating physician, Dr. Daniel Carroll, and the notes maintained by her massage therapist.[1] Claimant argues that if this evidence is properly considered alongside the other medical evidence of record, it clearly demonstrates that she suffers from a severe and persistent, albeit irregular, impact on her ability to work. On the other hand, the ALJ found Claimant's statements, as well as those submitted by her mother and husband, about the intensity, persistence, or functionally limiting effects of her symptoms were inconsistent with the objective medical evidence. (Tr. 19).

Claimant goes on to note several other examples of how she contends the ALJ specifically erred. She states that he mischaracterized how Claimant treats her pain, and her specific need for two hours of massage therapy per week. [Doc. 12, p. 19]. Claimant again references the testimony of the vocational expert as to absenteeism from work. [Doc. 2, p. 19]. Additionally, she argues that the ALJ improperly disregarded the medical opinion of Dr. Carroll, who opined she would likely miss two or more days per month due to her symptoms. [Doc. 12, p. 18]. She further asserts that the ALJ erred in finding Dr. Carroll's opinions regarding her mental limitations to be unsupported on the basis that Dr. Carroll "is a physical doctor not a mental doctor." (Tr. 25). Additionally, she argues that the ALJ improperly disregarded Dr. Carroll's opinion on the basis that he had failed to account for a discrepancy in the Claimant's gait when she dealt temporarily with plantar fasciitis. [Doc. 12, p. 20].

---

[1] The ALJ mistakenly refers to Dr. Daniel Carroll as "Dr. Carroll Daniel" in parts of his opinion.

7

In response, the Commissioner argues that the ALJ properly evaluated Claimant's residual functional capacity, and that Claimant is now asking the court to impermissibly re-weigh the record evidence and perform an improper *de novo* review. [Doc. 14, p. 2]. In support, the Commissioner provides examples from the ALJ's opinion where he methodically discusses Claimant's impairments and points to the record medical evidence substantiating his findings. [Doc. 14, pp. 2-5]. The Commissioner also contends that the ALJ accurately documented in his opinion that despite Claimant's medical records being extensive, most of her examination findings contained within them were "unremarkable." [Doc. 14, p. 3]. Additionally, the Commissioner contends that the ALJ reasonably relied on the prior administrative findings (PAMFs) of the state agency reviewers, found the physical and mental PAMFs persuasive, and generally adopted the suggested limitations.[2] [Doc. 14, p. 5].

Finally, the Commissioner argues that the ALJ properly evaluated Claimant's subjective symptoms. [Doc. 14, pp. 5-8]. Specifically, the Commissioner points to the "zone of choice" within which the ALJ operates when evaluating the evidence before him. To illustrate that the ALJ's decision adequately evaluated Claimant's symptoms, the Commissioner's brief includes the detailed description of Claimant's self-reported symptoms contained within the ALJ's opinion and identifies numerous citations included in the ALJ's opinion reflecting "generally normal physical and mental examinations throughout the record along with unremarkable imaging." [Doc. 14, pp. 6-8]. Additionally, the Commissioner notes that the ALJ considered the effectiveness of Claimant's medications and other treatments, Claimant's self-reported activities of daily living, and Claimant's subjective symptoms in the context of the longitudinal record. [Doc. 14, pp. 7-8]. Overall, the Commissioner argues that while the Claimant may understandably believe that the

---

[2] The Commissioner's brief also asserts that because Claimant's brief did not challenge the ALJ's evaluation of the PAMFs, she forfeited that argument. [Doc. 14, p. 5].

record supports her claim of disability, because the ALJ's opinion is supported by substantial evidence, this Court cannot intervene.

In order to fully and fairly address the issues raised by the parties pursuant to applicable law, the Court has reviewed Claimant's voluminous medical records, which the Court will reference below as necessary to analyze the issues raised by the parties. (Tr. Ex. 1F-31F). This includes the records contained in Exhibit 1F, 16F, and 22F which were generated both before and after the alleged onset date, and Exhibits 2F-15F, 17F-21F, and 23F-31F which contain records generated solely after the alleged onset date. Additionally, the Court has reviewed and considered the opinions provided by state agency medical consultants on initial consideration and reconsideration of Claimant's applications for benefits. (Tr. Ex. 1A-4A). Lastly, the Court has reviewed and considered the hearing testimony and other record evidence. (Tr. 43-70). Having done so, the Court will now address the errors alleged by Claimant in the context of this evidence, the parties' arguments, and applicable law.

### III. LEGAL ANALYSIS

The overarching issues for review are whether the ALJ properly supported his decision with substantial evidence when formulating the RFC, and whether he properly evaluated Claimant's subjective symptoms in accordance with SSR 16-3P(d). The Claimant bears the burden to show the extent of her impairments, however, at step five, the Commissioner bears the burden to show that there are jobs Claimant can perform, albeit with some adjustments. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512-13 (6th Cir. 2010) (citations omitted).

In evaluating the ALJ's decision, the Court must remember that the ALJ was entitled to a "zone of choice" in deciding whether to award Claimant disability benefits if the facts could support a ruling either way. *Blakely*, 581 F.3d at 406. As such, the Court is not permitted to disturb the ALJ's decision even if the Court would have decided the matter differently so long as the ruling

was rendered in compliance with applicable law and is based on substantial evidence. "Substantial evidence exists when a reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Stewart v. Comm'r of Soc. Sec.*, 811 F. App'x 349, 352 (6th Cir. 2020) (internal citations omitted); *Fox v. Comm'r of Soc. Sec.*, 827 F. App'x 531, 534 (6th Cir. 2020) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154, 203 L.Ed.2d 504 (2019)).

As part of the multi-step review of a Social Security case, the ALJ must make a residual functional capacity determination. *See* 20 C.F.R. § 404.1520. "Residual Functional Capacity" means "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs. . .." 20 C.F.R. § Pt. 404, Subpt. P, App. 2(c). Applicable regulations provide the following guidance for the agency when assessing a claimant's RFC:

> When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545(b). In rendering a decision about a claimant's RFC, an ALJ is prohibited from "defer[ring] or giv[ing] any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the Claimant's] medical sources." 20 C.F.R. § 404.1520c.

The ALJ found Claimant to have the severe impairments of fibromyalgia, cervical spondylosis, scoliosis, osteoarthritis, shoulder impingement, depression, anxiety, and attention deficit hyperactivity disorder (ADHD), but determined that Claimant did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment. 20 C.F.R.

§ Pt. 404, Subpt. P, App. 1 (the "Listings"); (Tr. 12, 15). The ALJ further found that Claimant retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except that the claimant can occasionally reach overhead bilaterally; can never climb ladders, ropes and scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch and crawl; retains the ability to understand, remember, and carry out detailed, but not complex instructions to maintain concentration, persistence, and pace on those types of tasks for two hour periods over the course of an eight hour workday, and can tolerate occasional interaction with the public. (Tr. 17). *See* 20 C.F.R. § 404.1520 (noting that step four of an ALJ's five question review involves formulating a claimant's residual functional capacity).

In making these determinations, the ALJ considered Claimant's extensive medical record, which includes two consultative exams, a hormonal consultation, and mental health treatment records, along with physical health treatment records from practitioners providing primary care, orthopedic, chiropractic, pulmonary, and allergy services. (Tr. Exs. 1F-31F). The ALJ also referred to Claimant's own Function Reports, completed on February 13, 2021 (Tr. Ex. 6E), May 11, 2022 (Tr. Ex. 10E), and February 16, 2023 (Tr. Ex. 12E).

Claimant does not contest the ALJ's analysis or findings regarding her physical abilities, "as she could on occasion perform at the light level of exertion with the limitations assigned by the ALJ," however, "[s]he contends the evidence shows she could not perform at this functional level multiple days per month." [Doc. 12, p. 11]. Claimant argues that in finding her not to be disabled, the ALJ mischaracterized evidence regarding the intensity, persistence, and limiting effects of her symptoms, which then led him to conclude that she would not need to be absent from work often enough to prevent her from working. [Doc. 12, p. 12]. The Court will now address

these assignments of error to determine whether the ALJ's decision is supported by substantial evidence.

## A.  Whether the ALJ "Misinterpreted" Evidence

Before considering whether substantial evidence supports the ALJ's determinations as to the intensity, persistence, and limiting effects of Claimant's conditions in formulating her RFC, the Court finds it necessary to first address Claimant's allegation that the ALJ misinterpreted the record, as the Court must consider whether any misinterpretation would undercut the ALJ's findings. In her brief, Claimant points to several different aspects of the ALJ's opinion which she asserts support a finding that the ALJ "mischaracterized" the record evidence. [Doc. 12, pp. 12-18].[3] Claimant also alleges that the ALJ erroneously used evidence in the record which pre-dated Claimant's onset of disability to support his conclusions. The Sixth Circuit does recognize that evidence presented which predates the onset of disability, "when evaluated *in combination with later evidence,* may help establish disability." *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 414 (6th Cir. 2006) (emphasis in original). Although logic dictates that medical evidence predating the alleged onset date, standing alone, should not be used by an ALJ as a basis to reject a claim of disability, that evidence may still provide necessary context for the medical evidence generated during the period of alleged disability. In fact, given the nature of Claimant's alleged disabling conditions, it would have been illogical for an ALJ to ignore the medical evidence of record generated in the months leading up to Claimant's alleged disability onset date.

As to the alleged misinterpretations, Claimant first takes issue with the ALJ's conclusion that she retains the "ability to vacation" and that this ability would support a finding that she is not

---

[3] As a threshold matter, the standard for a supportable decision by the ALJ is not whether they properly characterized the evidence in the record, but whether their factual findings were supported by substantial evidence. 42 U.S.C. § 405(g); *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009).

disabled. [Doc. 12, p.12] (citing Tr. 19, 20, 22). In finding that Claimant's statements regarding her mental limitations were inconsistent with other evidence in the record, the ALJ did rely upon two statements in Claimant's therapy records regarding vacationing. (Tr. 19). The first is from March 2020 noting that Claimant "continues to want to take a vacation during child's spring break" (Tr. 393) and the second from June 23, 2020, noting that Claimant is "going to the beach next week" (Tr. 410). Claimant points out that the referenced records are three years old, and there is no indication in them that she went on the planned vacation. [Doc. 12]. Additionally, she argues that even if she did go on vacation, that fact does not provide significant insight as to her ability to function mentally on a day-to-day basis. While the Court agrees that the mere ability to take a vacation to the beach does not necessarily indicate that Claimant can perform the required physical and mental tasks required in the work environment, the ability to take an international vacation may tell a different story. While the ALJ did not reference it directly, in Claimant's psychiatric progress note from May 2023 refers to Claimant "[t]raveling to the UK this month[.]" (Tr. 1333).[4] The Court finds that it would be reasonable for the ALJ to consider Claimant's ability to travel internationally in assessing her physical and mental abilities. Moreover, Claimant's travel is just one of the activities the ALJ considered in making his assessment. Others include Claimant contractually obligating herself to provide support for one-year post-closing to the purchaser of her business. (Tr. 22); Claimant's volunteer activities (Tr. 19, 22); Claimant's ability to assist her father with filing his own disability application (Tr. 19, 22); and the fact that she reads often (Tr. 20, 22). The ALJ primarily relied on these observations from the record to determine that Claimant was able to continue with some activities despite her reported extreme fatigue, brain fog, and mental health limitations.

---

[4] "[A] reviewing court may consider all the evidence in the administrative record, even if the ALJ does not mention it." *Dennis v. Comm'r of Soc. Sec.*, 779 F. Supp. 2d 727, 733 (E.D. Mich. 2011).

Claimant also takes issue with the ALJ referencing her volunteer work as support for his conclusions. (Tr. 19, 22, 23). In referencing this activity, the ALJ first cites a psychotherapy progress note from November 13, 2019, several months before Claimant's alleged onset date, and alludes to her involvement in volunteer activities. (Tr. 19, 22) (citing Tr. 379). The ALJ also cites to a psychotherapy progress note from November 19, 2020, which notes that Claimant has support from her social network and "volunteer work with an agency she feels called to serve." (Tr. 23) (citing Tr. 422). Additionally, in a Function Report from February 14, 2021, Claimant self-reported that she volunteers once a year for two days (Tr. 258), but subsequent Function Reports from May 11, 2022 and February 16, 2023 note that she no longer volunteers at all. (Tr. 285, 293). While Claimant's records do support the conclusion that she decreased her volunteer activities in January 2020, Claimant stated that she did so due to her father's health and family issues rather than due to any health issues she was experiencing. (Tr. 385). Overall, the evidence in the record seems to contradict the assertion that Claimant continued to volunteer regularly as of the date of her hearing before the ALJ. Rather, it appears that as of mid-2022, she stopped engaging in volunteer activities. Still, given that Claimant's volunteer work was merely one basis for the ALJ's reasoning and the fact that she continued to engage in it until at least mid-2022 by her own report, the Court must find that any error committed by the ALJ in failing to acknowledge the decrease from mid-2022 forward was harmless.

It is also of note that while Dr. Carroll stated in a letter dated November 21, 2020, that Claimant had experienced marked deterioration over the past 3 years, there was no mention whatsoever in any of her mental health records leading up to that time of her experiencing any physical issues nor of her feeling unable to engage in activities due to these limitations. (Tr. 430). Dr. Carroll's letter appears to describe someone wholly different than the person engaging in

therapy. While Claimant would have been expected to address her physical issues in greater depth with her physicians as opposed to her therapist, given the connection between physical and mental health issues, it is difficult to understand how Claimant would utterly fail to mention her physical health struggles to her therapist if they had impacted her ability to engage in activities to the extent Claimant asserts.[5] Moreover, during a May 2023 telehealth visit, Claimant advised that she was still contemplating part-time work although at the same time she reported that she lacks motivation and also mentions that she is trying to obtain disability. (Tr. 1327). During that same visit, claimant noted that she was walking as physical activity and was trying to increase the amount that she walked, and her therapist recommended that she restart her weightlifting. (Tr. 1329). There is no mention in these records of Claimant voicing any concern to her therapist about her physical ability to follow this advice. Additionally, Claimant spends time talking about her past business successes, and her current activities such as spending time with family and friends, watching her son play soccer, and being at the pool. (Tr. 1330). Claimant's records from this visit reflect that she was in no acute distress; her mood was euthymic; her affect was appropriate; she was alert and oriented; her speech was normal and her language appropriate; her thought process was logical and organized; her memory was good and intact memory, with appropriate attention span and focus; and her insight was good with no impairment in judgment. (Tr. 1331). In a June 2023 visit, Claimant noted that she was taking the international trip referenced above. (Tr. 1333). Claimant reported no medication side effects in her May and July 2023 visits, and her records reflect that her depression and ADHD were moderate with exacerbation/side effects. (Tr. 1337).

---

[5] Claimant had apparently advised her therapist of her physical health diagnoses because they are reflected in her therapy notes but there is no mention by client of how the physical health issues impacted her, at least not that were recorded by her therapist.

The Court next turns to Claimant's assertion that the ALJ erred in considering the year-long obligation she undertook to provide support services to the purchaser of her business. In addressing this assertion, the Court first observes that while Claimant alleges a March 1, 2020 date of disability onset, she did not sell her business until early 2020, with a transfer date of February 21, 2020. (Tr. 385). Moreover, Claimant's medical records state that she sold her business to spend more time with her family rather than because of disability-related reasons. (Tr. 391). Further, Claimant entered into this year-long agreement to provide ongoing support which extended well beyond her alleged onset date. Although the specific physical and mental activities that Claimant would engage in to provide this support are not defined anywhere in the record, it was reasonable for the ALJ to conclude that Claimant did not believe she was disabled from work when she agreed to provide this ongoing assistance. (Tr. 408). Moreover, Claimant has the initial burden of proof in this case, and it was for her to demonstrate why this contractual obligation did not in fact contemplate her engaging in substantial gainful activity.

Claimant further asserts that the ALJ erred in discounting her mental health challenges relying, in part, upon the fact that she assisted her father with his disability application. Claimant states this was error because her assistance to her father preceded her alleged onset date. However, Claimant's medical record reflecting her assistance to her father is dated January 31, 2020, roughly thirty days prior to her alleged onset date. (Tr. 385). As such, it was reasonable for the ALJ to consider this information to place Claimant's claims regarding her mental health limitations in context.

Claimant next takes issue with the ALJ's reference to a portion of the record evidence to support his finding that Claimant continues to read despite extreme fatigue, brain fog, and her mental health challenges. (Tr. 20, 22). Claimant argues that while she has the educational ability

to read, the ALJ's categorization does not account for the impact of her condition on this ability. [Doc. 12, pp. 15-16]. The part of the record the ALJ refers to for support is a psychotherapy progress note from February 20, 2020, a mere nine days before Claimant's alleged disability onset date. That entry refers to a book Claimant notes she has which she "hopes will give her some insights." (Tr. 389). Further, this was not the only reference the ALJ made to the record evidence in analyzing Claimant's abilities to understand, remember, or apply information and to concentrate, persist, or maintain pace. (Tr. 16).

Without question, there is evidence in the record which supports Claimant's contention that she has difficulty concentrating well enough to read. For example, during a depression assessment with her primary care provider on November 11, 2020, Claimant asserted that she generally had trouble concentrating long enough to read the daily newspaper. (Tr. 439). At the same time, her psychotherapy progress notes from November 2021 indicate that she was reading and researching to learn about family dynamics. (Tr. 949, 950). Additionally, Claimant stated on her Function Reports that she continues to read as a hobby. (Tr. 258, 284, 293). While one of the ALJ's references predated the alleged onset date, given that it did so by a mere nine days and because the record provides other examples supporting the ALJ's determination that Claimant retains the mental functioning necessary to read challenging material when she is motivated to do so, the Court finds that the ALJ did not err in considering Claimant's statement regarding reading made on February 20, 2020 nor in concluding that the record evidence does not support the limitations Claimant asserts that she has regarding the ability to concentrate long enough to read.

Finally, Claimant argues that the ALJ "erred in stating the Claimant did not find massage therapy helpful" because it is "a therapy absolutely necessary for her to function." [Doc. 12, p. 16]. The ALJ mentions Claimant's massage treatment three times in his opinion, initially to

demonstrate Claimant's ability to interact regularly with other people despite her social anxiety (Tr. 19), next in noting that her providers encouraged her to continue massage therapy to relieve her symptoms (Tr. 20) (citing Tr. 857), and finally in observing that some of Claimant's alleged pain was made better by heat and massage therapy (Tr. 21). While the ALJ includes these comments to support the efficacy of massage therapy in treating Claimant's symptoms, he also includes them to substantiate his conclusion that Claimant's statements about the intensity, persistence, and limiting effects of her symptoms are inconsistent with other evidence in the record, and to contrast the evidence in the record with Claimant's statements at the hearing. At Claimant's hearing, when asked about how effective her treatment regimen, including weekly massage therapy is, she stated it is "[p]robably not very effective" but allows her to "get out of bed more maybe and have a few more good days." (Tr. 50). A note from Claimant's massage therapist, who has been treating Claimant for nine years and is familiar with fibromyalgia, states that her treatment makes Claimant's condition bearable. (Tr. 337). While the ALJ might have somewhat overstated Claimant's discounting of the effectiveness of this treatment, that does not constitute reversible error. As noted above, the ALJ supported his findings with numerous other facts from the record evidence. While many of the ALJ's references, standing alone, would not be sufficient to support his conclusions, the collection of them provides more than a "scintilla of evidence to support his findings." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

### B. Whether Substantial Evidence Supports the ALJ's RFC Determination Regarding the Intensity, Persistence, and Limiting Effects of Claimant's Symptoms

Having determined that the ALJ did not misinterpret any record evidence to the extent that he committed reversible error, the Court will next consider whether the ALJ erred in his treatment of the medical evidence of record and the subjective information provided by Claimant

18

and her family members in formulating Claimant's RFC. The Court will specifically focus on Claimant's allegation that the ALJ erred in rejecting her assertions as to the intensity, persistence, and limiting effects that her symptoms have on her ability to work.

In evaluating an individual's symptoms, the ALJ must consider all symptoms and "the extent to which [a claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). The ALJ evaluates an individual's symptoms using a two-step process. First, the ALJ must consider "whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms." SSR 16-3P; *see also Stanley v. Sec'y of Health & Hum. Servs*., 39 F.3d 115, 117 (6th Cir. 1994). Next, the ALJ will evaluate the "intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." SSR 16-3P. If the objective medical evidence does not provide a sound basis for a disability determination on its own, then the ALJ must consider other evidence in the record "about the intensity, persistence, and limiting effect of an individual's symptoms." *Id*. Other evidence can include statements from the individual, medical sources, and other sources that might have information about the claimant's symptoms. *See* 20 C.F.R. § 404.1529(c)(3).

### 1. Medical Opinions

As to the ALJ's treatment of the medical evidence of record, Claimant takes issue with the ALJ's failure to find persuasive the opinions of Dr. Carroll, Claimant's primary care physician, and Sara Anderson, Claimant's primary mental health care provider. Because Plaintiff's claim was filed after March 27, 2017, the Social Security Administration's ("SSA") new regulations for evaluation of medical opinion evidence apply to this claim. *See* Revisions to

Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules), 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c. Under the new revised regulations, the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative findings, including those from your medical sources." 20 C.F.R. § 404.1520c(a).Instead of simply deferring to medical sources, an ALJ is required to consider multiple factors in evaluating the evidence including (1) supportability; (2) consistency; (3) a source's relationship with the Claimant; (4) specialization; and (5) other supporting or contradicting factors. 20 C.F.R. § 416.920c. This rule for the evaluation of opinion evidence departs from the rule which was applied to claims filed before March 27, 2017. Compare 20 C.F.R. § 404.1527 (the "old rule") with 20 C.F.R. § 404.1520c (the "new rule"). The rule now in effect notably "reduc[es] the articulation standards required for ALJs in assessing medical source opinions." 3 Soc. Sec. Disab. Claims Prac. & Proc. § 25:13 (2nd ed.). As other courts have noted in applying this revised rule, "[s]upportability and consistency will be the most important factors, and usually the only factors the ALJ is required to articulate." *Jones v. Berryhill*, 392 F. Supp. 3d 831, 839 (M.D. Tenn. 2019) (citing *Pogany v. Berryhill*, No. 4:18-CV-04103-VLD, 2019 WL 2870135, at *27 n. 7 (D.S.D. July 3, 2019)) (internal quotations omitted).

As an initial matter, the Court recognizes that fibromyalgia, one of Claimant's primary health conditions, is particularly difficult to diagnose and document, and the Court has carefully considered the challenges the condition presents in the disability context when reviewing the ALJ's findings and the record evidence. At the same time, the Court cannot overlook the fact that the ALJ is entitled to a "zone of choice," and it is not for the Court to reweigh the record evidence.

*Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 648 (6th Cir. 2011); *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

Here, the ALJ methodically discussed Claimant's reported impairments, including not only her fibromyalgia, but also the cervical spondylosis, scoliosis, osteoarthritis, shoulder impingement, depression, anxiety, and ADHD that she experienced, finding them all to be severe and likely to significantly limit her ability to perform work activities. (Tr. 12). At the same time, in concluding Claimant maintained the ability to perform light work, the ALJ noted that many of Claimant's medical imaging records depicted either normal or treatable conditions, that Claimant had engaged in various treatments and measures which appeared to alleviate her symptoms, and that Claimant regularly engaged in activities which were inconsistent with a finding of disability. *See Thompson v. Comm'r*, 1:23-CV-234, 2025 WL 747508 at *12 (E.D. Tenn. Feb. 14, 2025), *report and recommendation adopted*, 2025 WL 745595 (E.D. Tenn. March 7, 2025) (citing 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3)) (holding that when there is a discrepancy between a claimant's subjective complaints and objective medical evidence the ALJ must analyze other factors including the claimant's daily activities when determining how much weight to give to subjective complaints).

Turning now to the specific issue of how the ALJ analyzed Dr. Carroll's opinions in relation to those offered by consultative examiner Robert Blaine, M.D., the Court will begin with the letter that Dr. Carroll provided in November 2020, wherein he stated that Claimant's health had deteriorated over the last three years, and that she is "not able to work in any capacity." (Tr. 430). Dr. Carroll also opined in that letter that Claimant could not lift, carry, push, or pull anything greater than ten pounds; cannot sit or stand for more than ten minutes at a time; and cannot engage in any repetitive lifting, bending, or twisting. (Tr. 430). Additionally, he stated that Claimant's

mental impairments affect her concentration and attention span, as well as her daily activities. (Tr. 430). On August 19, 2023, Dr. Carroll submitted an updated opinion, in which he opined that Claimant could only sit/stand/walk for four hours of an eight-hour workday, could only sit for 30 minutes at a time, required the ability to shift positions at will, and could rarely lift up to ten pounds. (Tr. 1503-06). He further opined that Claimant had several mental impairments which would interfere with her ability to complete 10% or more of her work, and that she could not tolerate even low stress work. (Tr. 1506).[6]

In contrast, after Dr. Blaine's initial exam, he opined that Claimant could walk for four hours in an eight-hour day, lift and carry five pounds frequently and twenty pounds infrequently, and sit for eight hours with reasonable rest breaks, and was capable of handling her own affairs. (Tr. 723). After Claimant later underwent her second consultative exam, Dr. Blaine opined that Claimant could walk for longer than he had previously opined and could carry more weight than he had concluded previously. (Tr. 1114).

In assessing these opinions, the ALJ analyzed certain of Claimant's physical conditions separately. For example, the ALJ addressed Claimant's severe cervical pain which originated with a 2007 motor vehicle accident (Tr. 20, 720), and in doing so, found that Claimant's records from a September 2020 follow-up visit to her chiropractor, Dr. Bill Gillenwater, indicated that her symptoms were improving with chiropractic treatment and use of ice. (Tr. 701). The ALJ further noted that during a visit with Dr. Carroll on November 11, 2020, Claimant exhibited tenderness,

_____

[6] The ALJ improperly discounted Dr. Carroll's observations as to Claimant's mental limitations on the basis that he is a "physical doctor" and not a "mental doctor" (Tr. 25) because the record demonstrates that Dr. Carroll treats Claimant's mental health by prescribing her Lexapro. (Tr. 410). This error is harmless because Dr. Carroll does not identify any limitations caused by Claimant's mental health condition, and the extreme limitations he later identifies in his August 2023 letter are not substantiated by other record evidence. "Courts generally will excuse an ALJ's procedural violation as harmless error unless it prejudices the claimant on the merits or deprives him of substantial rights." *Lorraine R. v. Comm'r of Soc. Sec. Admin.*, No. 3:20-CV-00396, 2022 WL 4232839, at *4 (S.D. Ohio Sept. 14, 2022) (citing *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2007) (citation omitted)).

pain, and spasm in her back, but had normal muscle tone and coordination and cervical range of motion (Tr. 440), while at the same time, Dr. Carroll imposed significant limitations on Claimant's carrying, lifting, pushing, pulling, sitting, standing, bending, and twisting, and she was directed to continue with chiropractic treatment to alleviate symptoms. (Tr. 441). The following January, Claimant was found to have normal cervical range of motion when she presented for a shoulder injection (Tr. 562), and again at appointments with Dr. Carroll in July 2021 (Tr. 767) and April 2022 (Tr. 842), and finally at an October 2022 immunology appointment. (Tr. 1034). Additionally, the ALJ considered Claimant's testimony about how she dropped things, but did not find that testimony persuasive because Claimant's records revealed that her grip strength was normal. (Tr. 722, 1113). The ALJ considered the objective evidence as well, referring to an x-ray and MRI ordered by Dr. Carroll in March 2023. The x-ray showed no acute findings in the cervical spine and only mild degenerative changes, despite Dr. Carroll observing Claimant to have decreased range of motion and bilateral muscle spasms in her thoracic spine (Tr. 1274), and the MRI revealed that Claimant's dorsal spine was normally aligned and within normal limits. (Tr. 1377).

The ALJ also separately addressed Claimant's severe lumbar pain, which originated with a 1995 horseback riding accident. As to this pain, the ALJ noted that imaging from May 2021 reflected overall normal findings. (Tr. 725, 738). Additionally, the ALJ considered Claimant's statements regarding the limitations she experiences due to the knee and hip pain, she asserts occur due to the lumbar pain, but he found that they were not borne out by the medical evidence of record. For instance, in February 2021, despite Claimant's diagnosis of lumbosacral region radiculopathy, she was showing improvement with treatment from a chiropractor, as well as heat and massage therapy. (Tr. 703). Then, during the physical examination conducted by the consultative examiner in May 2021, Claimant was found to have normal range of motion in her

hips, knees, and lumbar spine. (Tr. 722). The ALJ also points out that during Claimant's first consultative exam on May 21, 2021, her straight leg raise was negative bilaterally for pain, while acknowledging that during a subsequent exam on March 1, 2023, Claimant exhibited pain at 5 degrees on the left and 30 degrees on the right (Tr. 1113). At the same time, Claimant's gait was generally observed to be normal. Further, a March 2023 x-ray noted no acute compression or deformities in the thoracic spine and only mild thoracic dextroscoliosis (Tr. 1273).

The ALJ addressed Claimant's shoulder pain separately as well, noting that while at times Claimant has exhibited tenderness, joint pain, and spasms (Tr. 440, 560, 1312) and has been diagnosed via x-ray and MRI with impingement rotator cuff tendinitis (Tr. 710, 734), subsequent imaging appeared normal. (Tr. 724, 735). Additionally, the ALJ noted that Claimant's range of motion was predominately normal (Tr. 440, 449, 562, 1095), though occasionally decreased (Tr. 767) and somewhat limited by pain. (Tr. 562). Moreover, injections alleviated Claimant's symptoms. (Tr. 562, 563). The ALJ determined that Claimant might have certain limitations in her ability to reach overhead as a result but that the limitations he assigned to her lifting and carrying based on her other conditions adequately addressed them.

The ALJ further considered the overarching issue of the interplay between Claimant's pain complaints in the various areas of her body and her fibromyalgia ("FM") diagnosis. For example, as to the FM diagnosis itself, he noted that in her first consultative exam with Dr. Blaine, Claimant was unable to identify her trigger points. (Tr. 19).[7] The ALJ further pointed out that despite Claimant's contention that her FM causes her to experience significant health challenges, when she saw Dr. Carroll on April 11, 2022, Claimant reported that she was feeling "good with

---

[7] The Court takes note of how notoriously difficult FM is to both diagnose and document. Providers are often mostly reliant on patient's reported symptoms, and imaging is unlikely to capture the severity of the reported issue.

minor complaints" and had "good energy." (Tr. 838). Then during an August 29, 2022 appointment, she reported how she was gradually improving and that her medication regimen was effective, although her FM was categorized as severe, and she was found to have multiple trigger points. (Tr. 854). The ALJ also addressed and contrasted findings from Claimant's appointments with Dr. Carroll on January 12, 2023, when Claimant presented with extreme brain fog attributed to FM and anxiety (Tr. 1281), and from June 2023, when she reported having no headaches, confusion, dizziness, paresthesia, numbness, or difficulty walking (Tr. 1310).

After reviewing the medical imaging records, and the records of both physicians, the ALJ found Dr. Blaine's initial limitations as to Claimant's physical limitations to be more persuasive than either his revised limitations or those assigned by Dr. Carroll. He rejected the limitations Dr. Carroll placed on Claimant's ability to sit/walk/stand, to push and/or pull, grip, and lift. (Tr. 25). In rejecting the limitations that Dr. Carroll assigned to Claimant's ability to walk, in addition to considering the above medical evidence, the ALJ considered Claimant's own contention that as of August 2023 she was unable to walk a city block but rejected it because he found that there was no medical evidence in the record to support that assertion.[8] (Tr. 25). The ALJ also rejected the severe limitations that Dr. Carroll assigned to Claimant related to her back, neck, and shoulder pain, pointing to an appointment in March 2023, where Claimant's imaging showed only "mild thoracic dextroscoliosis," with no other abnormalities (Tr. 1278) and relying upon the analysis outline above. The ALJ further observed that this objective medical evidence did not square with Claimant's reports of back pain, and notations in her March 2023 exam of decreased range of motion and bilateral muscle spasms. The ALJ likewise rejected Dr. Carroll's imposed limitations

---

[8] This severe limitation in Claimant's ability to walk appears to be contradicted by the notation in Claimant's psychiatric progress note from May 2023, that she was "[t]raveling to the UK this month[.]" (Tr. 1333).

related to Claimant's grip strength in reliance on the findings from the same March 2023 appointment because Claimant's records reflected that her strength was 5/5 in bilateral upper and lower extremities. Based upon the above, the Court finds that substantial evidence supports the ALJ's rejection of the extreme physical limitations assigned by Dr. Carroll to Claimant.

Claimant further asserts that the ALJ improperly disregarded Dr. Carroll's opinion because he concluded that Dr. Carroll failed to evaluate claimant's antalgic gait. [Doc. 12, p. 20]. The only evidence in the record that Claimant had an antalgic gait comes from records generated following her consultative examination, and Dr. Blaine notes that the origin of the antalgic gait is Claimant's plantar fasciitis, a temporary condition. (Tr. 1113). The ALJ observed that Claimant's gait had otherwise been consistently found to be normal, and that there is no documentation of ongoing lower extremity weakness. (Tr. 27). Instead of reading the portion of the ALJ's opinion referenced as a criticism of Dr. Carroll for failing to acknowledge that Claimant had an antalgic gait shortly before her last consultative exam, the Court reads this section as emphasizing how Dr. Carroll had consistently found Claimant to have a normal gait. The ALJ then relied in part upon that consistent finding in rejecting certain of the limitations that Dr. Carroll assigned to Claimant.

In addition to assessing the medical opinions offered regarding Claimant's physical health challenges, the ALJ assessed the opinions offered regarding Claimant's mental health conditions, finding that she suffered from the severe mental health impairments of depression, ADHD, and anxiety. (Tr. 12). The ALJ assessed the opinions that Dr. Carroll and Sara Anderson, LPC-MHSP offered as to these mental health conditions. (Tr. 12). In doing so, the ALJ observed that Claimant was a successful business owner, and did not transfer ownership of her business until February 2020, advising her therapist that she was selling the business so she could spend more time caring

26

for her son and husband, rather than due to physical or mental limitations. (Tr. 391). Claimant's records further indicate that while she struggled mentally in 2020 and had increased anxiety, the struggle appears to have been primarily due to the social limitations imposed during the pandemic, with her primary care provider ultimately prescribing her a psychotropic medication. (Tr. 396, 410). Claimant's medication dosage was increased in November 2020 because she reported being anxious, exhausted, and depressed, but at the same time she acknowledged that she was still interacting with friends and continued to volunteer. (Tr. 422). At that time, Claimant also "endorsed poor concentration, decreased attention span, insomnia, and irritability." (Tr. 23).[9] Still, the ALJ observed that Dr. Carroll's findings reflect normal recent memory, despite inattention. (Tr. 440). Dr. Carroll attributed Claimant's poor concentration and decreased attention to her anxiety and fibromyalgia, he prescribed a benzodiazepine, in addition to the increase of her psychotropic medication referenced. (Tr. 441).

The ALJ also took note that at a July 2021 appointment with Dr. Carroll, despite Claimant reporting anxiety, decreased concentration, depressed mood, excessive worry, and irritability, she was found to have normal speech, behavior, and thought content and was found not to be experiencing depression or memory impairment.[10] (Tr. 767). The ALJ also provides examples from the record evidence in March, April, and October 2022 where Claimant's behavior was observed to be normal (Tr. 782); her speech, behavior, thought content and judgment were found to be normal, despite her exhibiting a depressed and anxious mood (Tr. 842); and where an examination revealed no abnormalities in her mental status. (Tr. 1022). Then in June 2023, Dr. Carroll assessed Claimant's reported anxiety as mild and ADHD as stable on psychotropic

---

[9] At the same appointment, Dr. Carroll noted a 51-75% compliance with medications, and that despite Claimant's depression and anxiety, "[s]he is able to do activities of daily living without limitations." (Tr. 437).
[10] Claimant's depression screen score was "0." (Tr. 766).

medication. (Tr. 1313). Finally, the ALJ describes a psychiatric progress note from May 24, 2023, in which Claimant reports poor motivation, irritability, and rumination, but had a normal mental status exam. (Tr. 1327, 1331). A follow-up exam in June similarly showed a mental status within normal limits. (Tr. 1336). Importantly, despite these reported significant limitations, throughout this time, Claimant reported that she continued to drive, take care of her finances, and use the internet, among other activities. (Tr. 25). While two of the activities the ALJ referred to include Claimant "being on several community boards and mentoring other business owners," a closer review of the record does reveal that Claimant referred to these activities in the past tense as of 2023. (Tr. 23) (citing Tr. 1330). However, the Court finds the error to be harmless because these are only town of the several activities in which Claimant continued to engage that the ALJ noted in support of his conclusions.[11]

In further addressing the opinions offered by Ms. Anderson, including that Claimant would be expected to miss work two or more days per month due to her mental health conditions, the ALJ observed that Ms. Anderson had not seen Claimant in a year at the time she rendered her opinion, and that Claimant was experiencing "no apparent serious mental status abnormalities" as of that visit. (Tr. 1022). The ALJ further addressed the specific limitations that Ms. Anderson assigned to Claimant, which included that Claimant had a marked limitation in her ability to sustain concentration and persistence and to adapt and mild limitations in memory and social interaction. (Tr. 1371-72). The ALJ observed that these limitations did not appear entirely consistent with Ms. Anderson's conclusion that Claimant could manage her own benefits if awarded. The ALJ further found Ms. Anderson's assessment inconsistent with the remaining record evidence, and noted some of Claimant's more recent daily activities, which require

---

[11] Specifically, the ALJ noted that Claimant reported spending time with friends and family on a weekly basis and enjoyed watching her son play sports.

concentration. (Tr. 27). The Court must also take note that during her next-to-last visit with Ms. Anderson, which occurred on October 13, 2022, Claimant advised that in addition to traveling with her family to England for a vacation, she had also bought two houses with the intention of flipping one and renting the other. (Tr. 1019). While the same record noted that these activities had resulted in significant stress for Claimant, they do not appear consistent with Ms. Anderson's opinion that Claimant had marked limitations in her ability to sustain concentration and persistence and adaption, and mild limitations in memory and social interaction. (Tr. 1022). This is particularly true given that the last record from Ms. Anderson's practice, when Claimant was seen by Kindril Climer, PMHNP, reflects that Claimant was not experiencing depression or mood elevation, her speech was appropriate, thinking was "basically logical" with an intact memory and no signs of cognitive difficulty, and she had a normal attention span. *Id.* These observations by Ms. Anderson and Ms. Climer provide a sufficient basis for the ALJ to discount the limitations imposed by Ms. Anderson and by Dr. Carroll, who failed to provide any specific support for the mental-health related limitations he assigned to Claimant.

### 2. Claimant and Third-Party Statements

Finally, the Court will consider whether the ALJ erred in his treatment of Claimant's subjective statements as to the intensity, persistence, and limiting effects of her symptoms, as well as the treatment of the other third-party statements provided. The subjective information provided by a claimant and other non-medical witnesses is to be considered by an ALJ in making the RFC finding, but it is only one of many considerations. *See* 20 C.F.R. § 404.1545(a)(3). When evaluating the Claimant's alleged symptoms, the ALJ must consider certain factors, including:

(i) the claimant's daily activities;
(ii) the location, duration, frequency, and intensity of the pain or other symptoms;
(iii) precipitating and aggravating factors;

(iv) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the pain or other symptoms;

(v) treatment, other than medication, a claimant receives or has received for relief of pain or other symptoms;

(vi) any measures the claimant takes or has taken to relieve the pain or other symptoms; and

(vii) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529. The decision need not contain a discussion of and citations to every possible factor in order to be considered sufficiently specific. *See Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 664 (6th Cir. 2004). When there are contradictions between the medical reports, claimant's testimony, and other evidence, the ALJ has the "discretion to weigh all of the evidence and to resolve the significant conflicts." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997) (finding against the claimant where "the medical evidence regarding severity is not consistent and is capable of supporting more than one reasonable conclusion"). Here, after considering the evidence of this type offered on behalf of Claimant, the ALJ found that "the claimant and third party's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 19).

The evidence the ALJ had before him included hearing testimony offered by Claimant's husband, who testified that Claimant is often sick, in pain, and tired, and that he and his son have taken over the household responsibilities. (Tr. 62-65). He further testified that Claimant is unable to carry laundry. (Tr. 64). Additionally, Claimant's mother submitted a letter providing a history of Claimant's physical and mental decline and noting that she now requires significant assistance from family and friends, including for traveling to doctor's appointments. (Tr. 18) (citing Tr. Ex. 22E).

In addressing this information, the ALJ rejected the assertion by Claimant's husband that Claimant could not carry laundry because Claimant's medical records noted that she has normal strength in her upper and lower extremities. (Tr. 19) (citing Tr. 64). The ALJ further found that the testimony offered by Claimant's husband and the information in the letter provided by Claimant's mother are not objectively supported by the medical evidence. (Tr. 19).

Claimant also points out that the ALJ did not address the letter provided by Adrienne Presnell, Claimant's massage therapist. [Doc. 12, p. 21]. In her letter, Ms. Presnell advises that she has seen Claimant for massage therapy for nine years, opines that Claimant's conditions are consistent with FM, and describes the combination of therapies she uses to treat Claimant. (Tr. 337). She asserts that the massage therapy she provides allows Claimant to bear her condition, but that Claimant "still has significant chronic health conditions that impair her daily activities." (Tr. 337). The ALJ did not directly reference this letter, however he is not required to reference every piece of evidence in the record, provided that his analysis demonstrates a careful review of the evidence before him. *See Rottman v. Comm'r Soc. Sec.*, 817 F. App'x 192, 195-96 (6th Cir. 2020) (referencing *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004)). Here, as more fully described above, the ALJ's analysis reflects a careful review of the impact of massage therapy on Claimant's symptoms, and the fact that he did not directly analyze or cite to Ms. Presnell's letter does not constitute reversible error.

The ALJ specifically performed the analysis required for evaluating Claimant's symptoms in that he addressed the location, duration, frequency, and intensity of her reported symptoms and accompanying impairments, along with precipitating and aggravating factors. (Tr. 19-28) (citing Tr. Ex. 1F-4F, 6F-12F, 14F-19F, 21F-31F). More specifically, the ALJ evaluated evidence in the record and compared Claimant's statements about her symptoms with the

observations of her medical providers and her imaging reports. *Id.* Additionally, the ALJ included a discussion of the ongoing treatment being used to address Claimant's symptoms, noting the effectiveness of her medication regimen including the medications prescribed to help reduce symptoms she experiences due to her small airway disease (Tr. 14) (citing Tr. 435, 442), her FM (Tr. 19) (citing Tr. 482), her mental health disorders (Tr. 23) (citing Tr. 410, 437), her chronic joint pain (Tr. 18), and her chronic infections (Tr. 18). The ALJ also noted that injections helped Claimant significantly, and that alternative treatments, such as massage therapy and chiropractic treatment appeared to be effective in mitigating Claimant's symptoms. (Tr. 21-22) (citing Tr. 562, 701, 703).

Finally, the ALJ considered Claimant's daily activities. *See* 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i) (directing consideration of a claimant's daily activities when considering the severity of alleged symptoms). As previously noted, Claimant reported that she is still able to take care of her minor child and occasionally attend his sporting events, had assisted her father with his own disability application (albeit roughly thirty days before her alleged onset date), maintains a Facebook page, reads, vacations, volunteers, gardens, spends time by her pool, checks emails, orders groceries online, walks her small dog, performs personal care, pays bills online, cooks simple meals, and spends time with family and friends. (Tr. 18) (citing Exs. 6E, 10E, and 12E). While Claimant had apparently discontinued the volunteer activities the ALJ referenced prior to her hearing, the other activities cited to by the ALJ are more than sufficient to support his conclusions. Further, the ALJ did not directly reference all of Claimant's activities which are documented in the record that would support him finding that Claimant's impairments were not as limiting as she suggested, such as Claimant going on an international vacation and purchasing two homes within a two-week period in late 2022. (Tr. 1019). Claimant purchasing a

home to "flip" and one to rent could call into question the extreme limitations assigned to her by her physical and mental health providers and those that she self-reported.

In conclusion, the Court finds that the ALJ appropriately evaluated the medical evidence of record, Claimant's symptoms, and the statements of Claimant and third parties regarding the alleged severity and limiting effects of those symptoms. Specifically, the ALJ engaged in an extensive review of the record and expressly considered all medical opinions and prior administrative medical findings, Claimant's treatment history and the effectiveness of her medications, and her reported daily activities. In doing so, the ALJ demonstrated that substantial record evidence supported his conclusion that Claimant's reported symptoms and limitations were not entirely consistent with the record evidence.

## IV. CONCLUSION

While Claimant has a commendable work history and it is without question that she experiences significant physical pain and limitations and mental health challenges, after a careful review of the entire record in this cause, and for the reasons stated above, the Court finds that the ALJ's decision was supported by substantial evidence. Further the Court finds that the ALJ conformed to the applicable legal standards in rendering his decision. As such, the undersigned **RECOMMENDS** that Claimant's request for remand be **DENIED**, and the final decision of the Commissioner be **AFFIRMED**.[12]

Respectfully submitted,

---

[12] Objections to this Report and Recommendation must be filed within 14 days after service of this recommended disposition on the objecting party. 28 U.S.C. 636(b)(1); Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Fed. R. Civ. P. 72(b). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987). Additionally, failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140 (1985).

/s/Cynthia Richardson Wyrick
United States Magistrate Judge